MARY BABIRECKI, by STEPHEN BABIRECKI, her next friend, and STEPHEN BABIRECKI, individually, complainants-appellants,

*v.*

ANDREW G. VIRGIL, FRANCES VIRGIL, LOUIS J. VIRGIL and MAMIE VIRGIL, defendants-respondents.

[Decided May 17th, 1926.]

Evidence examined, and *held*, that the defendants have not sustained the burden which the law cases upon them under the facts established by that evidence to sustain the contention that the deed in question was supported by a valid consideration.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Church, whose opinion is reported in *98 N. J. Eq. 118.*

*Mr. John V. Laddey,* for the appellants.

*Mr. Frank B. Bozza (Mr. John W. McGeehan, Jr.,* of counsel) and *Mr. William H. Smith,* for the respondents.

The opinion of the court was delivered by

WHITE, J.

The important facts seem to us to be as follows:

Andrew and Louis Virgil were brothers, and bought, collected and sold junk.   Louis had judgment creditors, and

his wife, Frances, was, therefore, made a partner with Andrew, instead of Louis, who, however, with Andrew, carried on the work of the firm. Two adjoining lots of ground in South Orange were purchased (originally on installments) and title to one lot taken in the name of Frances (Louis' wife) and the title to the other lot in the name of Mamie, who was Andrew's wife. Subsequently, the "outfit" built quite an expensive house and place of business (with the firm name "A. Virgil & Co." carved on it) on the lot to which Mamie held title. Naturally, this threw the adjustment out of equilibrium, whereupon both lots were conveyed to an intermediary (a clerk in the office of Howe & Davis, counselors of high standing in this state), and the intermediary on the day following conveyed both properties to Frances, wife of Louis, and Mamie, wife of Andrew, in equal shares as tenants in common. This was in 1917. Subsequently, Louis' judgment debts seemingly having disappeared, he also became a member of the firm, so that in 1921 the partners were Andrew, Frances and Louis, and the title to the real estate was vested in equal shares in the two wives, Frances, who was a member of the firm, and Mamie, who was not.

On January 28th, 1921, the firm negligently injured a child, Mary Babirecki (one of complainants), three and a half years of age, who, with her father, instituted suit for damages in the circuit court against the three partners, Andrew, Frances and Louis. This suit was commenced April 2d, 1921, and, thereupon, on May 6th, 1921, Frances and her husband, for the expressed nominal consideration of one dollar, conveyed her undivided half interest in the real estate to Mamie, and on the same day the members of the firm executed a chattel mortgage to one Rose Cursi for all the personal property of the firm, consisting of auto trucks, &c., under which chattel mortgage the partners' ownership in the chattels was closed out by foreclosure on March 29th, 1922.

On February 10th, 1922, trial of the damage suits resulted in verdicts in favor of these complainants, and on March 10th, 1922, judgments thereon aggregating something over

$4,500 were entered against the three partners, and an execution, issued April 5th, 1922, naturally proving fruitless, this bill to set aside as fraudulent the deed of May 6th, 1921, from the partner-wife, Frances, who was liable for the prior accident, to the non-partner-wife, Mamie, who was not, was filed.

Under these circumstances, this court held, in an opinion by Mr. Justice Katzenbach (*97 N. J. Eq. 315*), reversing a decree of dismissal entered on a previous trial of this case— (1) that the statute to protect creditors against conveyances made to defraud them, extends its protection to those who at the time of such conveyances have valid rights of action for damages for torts, which rights are subsequently reduced to judgment before attack is made upon the fraudulent conveyances, and (2) that the burden of proving, when attacked as fraudulent, the consideration of a deed where no consideration was paid at the time of the conveyance, is upon the grantee.

At the present trial the respondents attempted to bear the burden thus defined, by setting up an alleged previous contract in writing between Frances and Mamie, said to have been entered into (August 16th, 1917) nine days before the 1917 conveyances to them as tenants in common above mentioned, whereby it is said to have been agreed that the title to both properties should be conveyed to Frances and Mamie in equal shares, but that Frances was indebted to Mamie in the sum of $2,500, and should pay her six per cent. interest thereon annually, and the principal within three years, and that, upon default in so doing, she, Frances, should deed the undivided half interest so to be conveyed to her to Mamie, in full extinguishment of any interest of Frances in the property. It is further alleged that Frances never paid any interest in accordance with this agreement, nor did she pay the principal, and that the conveyance of 1921, now attacked, was, in reality, a performance by Frances of this contract on her part. This contention is substantiated by the testimony of Louis, Frances, Andrew and

Mamie and of Mamie's sister, whose name appears as a sub-scribing witness to the alleged contract.

The learned vice-chancellor thought the testimony of these five witnesses to be controlling and dismissed the bill. We think, in so doing, he failed to give full consideration, on the one hand, to the unreliability, resulting from self-interest, of the testimony of the members of this one-business family, and, on the other hand, to the circumstances tending to indicate its untruthfulness.

The self-interest, of course, is manifest. The accident occurred in January, 1921, and when suit was brought against the three partners in April, it became evident that the one-half interest in the real estate to which Frances (who was one of the partners) held title, would be taken to satisfy the damage suffered by the injured child should the latter recover judgment. Frances, thereupon (on May 6th, 1921), conveyed this half interest to Mamie, who was not a partner (although her husband was), and in whose hands, therefore, it was thought it would be safe. Unless this deed can be shown to rest upon a *bona fide* valuable consideration, the injured child will be paid at the expense of this family enterprise, whereas, if such a proper consideration can be successfully established by the testimony of those interested in this family enterprise, the loss which would result to it in payment to the injured child will be avoided.

Turning now to the accusing circumstances: The deed in question, now under attack as fraudulent, was drawn by and acknowledged before respondents' counsel, an attorney of the bar of this state. It expressed a nominal consideration, was stamped with a one dollar revenue stamp, and recited: "The purpose of this conveyance is to vest in Mamie Virgil, wife of Andrew G. Virgil, the full and absolute title in fee-simple which was formerly enjoyed by Frances Virgil, grantor herein, and Mamie Virgil, grantee herein, as tenants in common." If respondents' counsel at the time he prepared this deed had known of this contract in writing, of course, he would have been only too glad to make the expressed consideration $2,500 instead of nominal, and would

have stamped the deed accordingly, and the recited purpose, instead of what it was stated to be, would have been to carry out the terms of the written contract. Obviously, respondents' counsel knew nothing of this written contract when he drew this deed. Could it be that if the contract had then, in fact, been made, respondents, with the purpose of having it performed, would not have advised their counsel of its existence? We think not.

Again, it is asserted that the conveyances of 1917, whereby title to the two properties was put in Frances and Mamie in equal shares as tenants in common, were made in pursuance of this alleged written contract of nine days before, one of the terms of which pledged Frances' half in the real estate in question in what was, in effect, a mortgage to Mamie for a previous debt of $2,500 and interest, and provided for a voluntary deed from Frances in case of default. Yet this alleged written contract containing this mortgage feature was neither acknowledged nor recorded. The conveyances (of 1917) now said to have been drawn in pursuance of this alleged contract were drawn, executed and acknowledged in the office of Howe & Davis, who represented all the parties, and, of course, it is out of the question for anyone knowing the standing of these lawyers to suppose that this important contract securing such an interest in real estate would have been permitted by them to remain in its crude form and unacknowledged and unrecorded, if they had known of its existence. Standing alone, the conveyances are inconsistent with the alleged intent of the contract that Frances' interest was to be contingent or dependent upon her paying $2,500 within three years with annual interest. These facts alone convince us that there can be no doubt that Howe & Davis knew nothing about these contracts, when, as the legal representatives of these parties, they prepared these conveyances, but if there was such a doubt it is fully removed by the fact that neither of these lawyers were called by their clients (who, of course, were the only ones who could call them) upon this point. This brings us to the question, If this alleged written contract had, in fact, existed when Howe &

Babirecki *v.* Virgil.    *99 N. J. Eq.*

Davis were employed by these respondents to prepare the deeds and to attend to the 1917 transfer of title, would knowledge of this written contract have been withheld from them by their employers? Decidedly, we think not. The evidence shows that Howe & Davis had represented these Virgils in numerous real estate deed and mortgage transactions before 1917. In fact, so far as the record shows, the conveyance of 1921, now under attack, seems to be the only one with which any of these Virgils ever had to do, in which they were not represented by Howe & Davis. What possible reason could the Virgils have had in withholding knowledge of this written contract from the attorneys they employed to do the conveyancing contemplated by its crude terms? We think there could only have been one reason, and that was the non-existence of the contract itself at that time.

Coming now to the writing itself alleged to constitute this contract, which is photostatically reproduced in the record, it is dated August 16th, 1917, and as was stated in the opinion of Mr. Justice Katzenbach in the former appeal, "is written on a leaf taken from an old account book apparently by an unskilled person, and bears upon its face the evidence of being a home-made document." At the former trial the learned vice-chancellor erroneously excluded questions in cross-examination tending to bring out and test the circumstances attending the drawing and signing of this document. At the present trial these questions were properly admitted, and, as a result, all of the respondents, and also Mamie's sister, who was the subscribing witness, testified that the contract was prepared in his own handwriting by Louis Virgil in the presence of all of them, and that he composed the matter as well as the form employed without outside assistance of any kind. A photostat copy of a dictation test of Louis while on the stand also appears in the record. The dictation was of parts of the alleged written contract, and a comparison of the misspelled and distorted words written down by Louis as a result of this dictation, with the writing itself, convinces us that the latter, if, in fact, written by Louis at all, was never the creation of his

unassisted brain and skill. This fact, in itself, gravely discredits the entire testimony of the five interested witnesses upon which the vice-chancellor relied. If that testimony was untrue in this important respect it was quite likely equally untrue with respect to the time when this so-called agreement was, in fact, concocted. At least, we think it quite clear, taking all the circumstances to which attention has been called together, that the respondents have failed to successfully bear the burden cast upon them (as decided by this court in the former appeal) by the circumstances of this case, of showing that there was, in fact, a *bona fide* valuable consideration for the conveyance in question.

The decree is therefore reversed and the cause remanded to the court of chancery, in order that a decree may be entered by that court in accordance with the prayers of the bill in so far as justified by the views herein expressed.

*For affirmance*—KALISCH, BLACK, CAMPBELL, JJ. 3.

*For reversal*—TRENCHARD, PARKER, KATZENBACH, WHITE, GARDNER, VAN BUSKIRK, MCGLENNON, KAYS, HETFIELD, JJ. 9.